TROUPE *v*. ANCRUM.

Opinion delivered November 8, 1920.

1.  REFORMATION OF INSTRUMENTS—MUTUAL MISTAKE—EVIDENCE.— While, to justify reformation of an instrument for mutual mistake, there must be something more than a mere preponderance of the evidence, the rule does not require that the proof be undisputed; it is sufficient if the testimony is unequivocal and clear, that is, such as to satisfy the court that the mistake was made and that the instrument docs not express the intention of the parties.

2.  REFORMATION OF INSTRUMENTS—EVIDENCE.—Evidence *held* to entitle defendant to a reformation of his deed.

3.  REFORMATION OF INSTRUMENTS—SUFFICIENCY OF PRAYER.—Where defendant pleaded a mutual mistake in the description contained in his deed, and prayed that plaintiffs be required to execute a deed covering the property sold to him, the prayer was sufficient to authorize a decree for the reformation of the deed.

Appeal from Jefferson Chancery Court; *John M. Elliott,* Chancellor; reversed.

*Toney & Craig,* for appellants.

It is clear from the evidence that Jordan sold Troupe the land on which he (Troupe) now resides, and the law is well settled. The proof is clear, unequivocal and convincing that a mistake was made and a reformation should have been decreed and the chancellor erred. Renfrow was not an innocent purchaser.

*A. R. Cooper,* for appellees.

1. The law regarding actions for damages for deceit or misrepresentation is well settled. Not every misrepresentation of the vendor in regard to property sold is a fraud. If the means of information are alike accessible to both parties, so that with ordinary prudence or vigilance the parties might rely on their own judgment they must be presumed to have done so, or if they have not so informed themselves they must abide the consequences of their own inattention and carelessness. 47 Ark. 148; 11 *Id.* 58; 71 *Id.* 91; 62 *Id.* 20; 112 *Id.* 489; 101 *Id.* 603; 95 *Id.* 375; 11 Ark. 58; 30 *Id.* 373; 26 *Id.* 28; 2 Pom. Eq. Jur., § 893. A preponderance of the evidence is not sufficient. 62 Ark. 20. To justify a court of equity in rescinding or cancelling or reforming a contract for the sale of land a clear case should be made and the proof clear and satisfactory that a misrepresentation was made and that the plaintiff *relied* upon it and was induced thereby to make the contract. 62 Ark. 20; 95 *Id.* 375.

2. There was no misrepresentation here. Appellant got the land he knew he was to get. Equity will not decree specific performance or reformation unless the terms of the contract are clearly and unequivocally proved. The burden was on appellant. 82 Ark. 33. Slight and trivial improvements or outlays do not raise an equity in favor of a donee to have a gift enforced. 63 Ark. 101; 109 *Id.* 310; 109 *Id.* 617. Specific performance of an oral contract for sale of land will not be enforced unless it is proved by a decided preponderance of the evidence that the contract was made and what its precise terms were. 78 Ark. 158; 82 *Id.* 33; 15 *Id.* 322;

23 *Id.* 421. The testimony is not sufficient as to the description of the land. Troupe is estopped; he had possession of the deed for a reasonable length of time. 81 Ark. 269. It was his duty to read the deed and make its contents known to himself. 87 Fed. 63; 178 S. W. 399; 84 *Id.* 349; 71 *Id.* 185.

3. Equity looks to the substance of a contract or transaction rather than the form. The transaction in substance though not in form was the same as though the real estate had been deeded to Jordan, who had given his notes and then he in turn had conveyed to Troupe. Equity looks to the substance, the intent, not to form. 105 Ark. 592; 44 *Id.* 251; 92 *Id.* 63. The vendee in an executory contract for sale of land is the equitable owner, while the vendor has merely a lien for the purchase money, and the vendee must suffer any loss which may happen and is entitled to any benefits which may accrue in the interim between the agreement and the contract. The vendor holds the legal estate in trust for the purchaser. Eaton on Equity, p. 70, § 21; 63 N. Y. 301; 1 N. J. Eq. 460; 21 *Id.* 599. If any one was guilty of misrepresentation it was Jordan. Troupe, Ancrum and the realty company were *bona fide* purchasers and holders.

4. Renfrow was a *bona fide* holder to the extent of one-half of four of the notes, and the decree as to him should be affirmed. The representations, if really made, were insufficient to constitute the basis of a cross-complaint, as they were mere expressions of opinion, and appellants had equal opportunity to ascertain the conditions, and, if they failed to do so, they assumed all risks, and they did not rely upon the representations of Jordan but used their own judgment. The testimony is clear and unequivocal. As to specific performance, there is no evidence of any precise agreement. It was the duty of defendant to examine the deed in a reasonable time after receiving it, and, failing to do so, he is estopped. See cases *supra*. If Jordan was guilty of fraud and de-

ceit, he is certainly responsible in damages. Renfrow is the owner of half interest in the notes originally made to the realty company and never had any notice of appellant's contentions or equities, and the lower court so properly found and is an innocent purchaser and the decree should be affirmed.

WOOD, J. This suit was instituted by J. H. Ancrum and F. E. Renfrow, who were holders of eight promissory notes executed by the appellants to Ancrum and the Union Realty Company, amounting in the aggregate to $499.96. The complaint alleged that the notes evidenced the balance due on the purchase price of the southwest quarter of the northeast quarter of section 33, township 5 south, range 10 west, containing forty acres, more or less; that a vendor's lien was retained on the above land to secure the payment of the purchase money; that four of the notes made payable to the Union Realty Company were transferred for value to F. E. Renfrow. The prayer was for the amount of the notes with interest and that a lien be declared on the lands described.

Appellants answered admitting the execution of the notes, but they set up that the notes were executed for the northwest quarter of the northeast quarter of section 33, township 5 south, range 10 west, instead of the lands described in the complaint; that the appellants were placed in possession of the lands described in their answer by the agent of the vendors, who represented that the same was the land which appellants had purchased; that appellant, G. G. Troupe, was an old, ignorant negro, not familiar with the survey and description of the land in question, and he accepted the deed executed by the vendors, believing that the same was a deed to the land which the vendors put him in possession of. Appellants tendered the balance due on the purchase money notes and prayed that the complaint be dismissed or that the vendors be required to execute to them a deed to the lands described in their answer.

The allegations of the answer and cross-complaint were denied. After the institution of the action Ancrum died, and the cause was revived in the name of his administratrix.

Ancrum testified that he and the Union Realty Company owned the land in controversy. They had an agreement with one Dr. H. L. Jordan, a colored man, to sell him four hundred acres of land, including the tract in controversy. They were to deliver a warranty deed to Jordan, or to whomsoever he might direct, in tracts of forty or eighty acres. Jordan would give a description of the land sold by him to various parties, and the vendors would convey to these parties and the deeds would be delivered by Jordan. Jordan had the right to sell the land and put the purchasers in possession. Witness executed the deed describing the land as Jordan directed and delivered the same to Jordan. At the time witness sold the land to Jordan, Evans, a white man, was witness' agent and had possession of the improved land upon which Troupe is now living. Witness wrote him to turn the property over to whom Jordan directed.

Jordan testified that he entered into a contract to sell Troupe the land described in the complaint. He was not sure of the description. The forty was in the southwest corner of the 400-acre tract. When he went to show Troupe the property, he went just one-half mile this side of where a little field is and showed him the improved land. Troupe said: "I would like to have this field." Witness said: "The line goes through this field. If you will buy eighty acres, you will get it all. I do not know where the lines are;" and that he would have to take his chances on getting the field. Witness further testified: "At the time I sold Troupe the land I knew the number of each tract. I would take a little plat and pick out the forty and say: 'About here is your forty.' I knew when I sold Troupe the land I was selling him the southwest forty, but I did not know where the lines were. I never described the land properly to Troupe until I de-

livered him the deed which was recorded before delivery. Troupe paid me $40 extra for the improvements on the land. I have since tendered Troupe the $40."

Troupe testified substantially as follows: He lives on the forty acres bought from Jordan. When he bought the land Jordan pointed out the little house, the fencing and the cleared land and said: "Now, practically all of this land is fresh land, and, Brother Troupe, it is a bargain." Witness told Jordan that he was too old to clear the land, and that he would not buy land from anybody that was not cleared. He told Jordan this while he was standing on the land where he now lives. Jordan said to witness: "Now, Brother Troupe, here is this forty. It is practically fresh land, and Mr. Ancrum says that whoever gets this forty acres of land must pay extra for this improvement." A day or two after that he asked Jordan the price of the improvement and Jordan replied: "$40 for the improvement." Witness paid Jordan a total of $250. Jordan told witness he would get Ancrum to write Travis Evans to give witness possession. Ancrum wrote Evans, who had the place in charge, and told him to turn over the keys to witness. Witness went to Evans, secured the keys, and moved upon the place which he now occupies. Witness had paid between $250 and $300 in improving the place. Neither Jordan nor Ancrum had ever objected to witness' occupancy of the place. Witness was an old negro, and knew nothing about the description or survey of land by metes and bounds. The deed, when given witness, was recorded, and witness thought it was the deed to the property upon which he was then living.

Evans testified that he had in charge the house and improved land where Troupe now lives before Troupe moved on it. Ancrum wrote witness a note saying that he had sold the place to Troupe and directed witness to turn the keys over to Troupe, which witness did. Witness saw Doctor Jordan after that, and he told witness that he had sold the place which witness had in charge

to Troupe. After witness had turned the place over to Troupe, he was in Ancrum's office lots of times, and he told Ancrum that he had turned the place over to Troupe, and Ancrum said that it was all right.

Frank B. Anthony testified that he was a surveyor. Doctor Jordan employed him to survey the land in controversy. Troupe was present and helped him do the work. When Troupe's property was reached, Troupe objected to the survey. He said something was wrong.

Another witness testified that he bought from Doctor Jordan the forty just north of that owned by Troupe; that the land he bought included the little field and property occupied by Troupe; that Troupe told witness after the lines were run off that he bought the south forty; that Doctor Jordan told him the south forty would get most of the improvements.

Jordan, in rebuttal, testified that he told Troupe that he was preparing to have the ground surveyed, and that the matter of where the lines ran would be determined when it was surveyed; that in the meantime Troupe could move in. When it was found that Troupe was on the wrong land, he offered him the $40 back.

Another witness (Jenkins) testified to the effect that, while he was negotiating for the purchase of a tract of land with Jordan, Jordan pointed out to witness the forty where Troupe lived and said: "Here is a forty; some of it is improved, and it has a house on it. I have just sold that to a fellow, and he is going right along," and told witness that if he had been earlier he would have had a chance to get it. Troupe told witness the next week that he had bought the place.

The testimony shows that the deed to the land described in the complaint was executed and recorded and delivered to Troupe, and he accepted the same.

The above are substantially the facts upon which the court entered a decree in favor of the appellees, from which is this appeal.

In *Beneaux* v. *Sparks*, 144 Ark. 23, we said: "Equity will not reform a deed on account of mistake in description, unless the proof of such mistake be clear, unequivocal, and convincing, nor unless the mistake is clearly shown to be common to both parties. While there must be something more than a mere preponderance of the evidence to show mutual mistake, the rule does not require that the proof be undisputed. The requirements of law are fully met when the testimony tending to show a mutual mistake is unequivocal and clear; that is such as to satisfy and convince the court that the mistake was made and that the instrument was so drawn as not to express what the parties to the contract intended."

The outstanding fact, which the testimony proves, is that Troupe intended to buy and Jordan intended to sell the forty acres of land on which the house was situated into which Troupe moved after he purchased the land. At the time the land was sold, Evans was occupying the same. Jordan told Evans that he had sold the land to Troupe. We do not find anywhere in the testimony that Jordan denies that he intended to sell Troupe the forty acres on which the house into which Troupe moved was situated. The testimony of Troupe, Evans and Jenkins is clear and unequivocal to the effect that Jordan said he had sold to Troupe the land on which the house was situated into which Troupe moved. While Jordan stated that he knew when he sold Troupe the land that he was selling him the southwest forty, he also states that he did not know where the lines were. The testimony of Evans and Jenkins to the effect that Jordan told them that he had sold to Troupe the land on which the house into which Troupe moved was situated is not anywhere expressly denied by Jordan; nor does Jordan deny the testimony of Troupe that he told Jordan that he (Troupe) was too old to clear land, and that he would not buy land from anybody that was not cleared, and that Jordan in response to this pointed him out the forty on which the house was situated. True, Jordan testified

that he told Troupe that he didn't know where the lines were, and that, unless he bought the entire eighty, he would have to take his chances on getting the field. But this, as we view the testimony, does not dispute the positive and unequivocal testimony of Troupe and the other witnesses to the effect that Jordan had sold Troupe the land on which the house was situated. The proof is clear, satisfactory, and convincing that, although neither Jordan nor Troupe knew at the time of the sale and purchase what the correct description of the land was on which were the improvements, nevertheless Jordan intended to sell and Troupe intended to buy that forty. Such being the case, the court erred in not reforming the deed to Troupe so as to effectuate the intention of the parties. While there is no specific prayer in appellants' answer for reformation of the deed, yet there is a prayer that "plaintiff be required to execute to him a deed to the northwest quarter of northeast quarter of section 33, township 5 south, range 10 west, upon which he now resides and which was sold to him by the plaintiff," etc.

This prayer was but tantamount to asking for a reformation of the deed. Equity ignores mere form and looks to the substance. Under the doctrine of *Beneaux* v. *Sparks, supra,* the appellants were entitled to have the deed reformed. See, also, *Darnell* v. *Bibb,* 143 Ark. 580; *Cain* v. *Collier,* 135 Ark. 291; *Welch* v. *Welch,* 132 Ark. 227.

The decree is therefore reversed, and the cause will be remanded with directions to the chancery court to enter a decree in favor of appellants reforming the deed so as to convey to appellants the lands as described in their answer, and in favor of appellees for the unpaid purchase money, and for such other proceedings as may be necessary not inconsistent with this opinion.